AS CORRECTED: MAY 13, 2019
RENDERED: APRIL 18, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-000104-DG

DATE 5/13/19 Kim Redmon, DC

JOHN B. BAUGHMAN                                                        APPELLANT

                          ON REVIEW FROM COURT OF APPEALS
V.                                 CASE NO. 2016-CA-001181-MR
                        FRANKLIN CIRCUIT COURT NO. 05-CI-01007

COMMONWEALTH OF KENTUCKY,                             APPELLEES
ENERGY AND ENVIRONMENT CABINET
AND JEFFREY LANCE BOWLING

## OPINION OF THE COURT BY JUSTICE HUGHES

## AFFIRMING

The Energy and Environment Cabinet (Cabinet) is tasked with regulating Kentucky's environment to protect public health, including preventing degradation of the waters of the Commonwealth. Beginning in 2004, the Cabinet notified Jeffrey Bowling (Bowling), the owner of five wastewater treatment plants in Johnson County, Kentucky, that his plants were improperly operated and maintained. These plants were discharging untreated sewage into Kentucky waters, posing health hazards to people in the area. After Bowling failed to resolve the plant conditions, the Cabinet filed a complaint against him seeking a temporary injunction and requesting that the trial court appoint a receiver. At the conclusion of the litigation — almost nine years later — the court-appointed receiver was owed $27,005. Recognizing the

difficulty the receiver would have collecting from Bowling, the trial court assessed this amount against the Cabinet. On appeal, the Court of Appeals reversed the trial court, holding that only Bowling could be liable for the monies owed to the receiver. John B. Baughman, the receiver, sought discretionary review on behalf of himself and his predecessor receiver. The sole issue for review is whether the trial court abused its discretion in assessing the receiver's outstanding balance[1] against the Cabinet. Finding no abuse of discretion, we affirm the Court of Appeals' opinion reversing the Franklin Circuit Court's order requiring the Cabinet to pay the receiver's outstanding balance and remand to the circuit court for entry of a new order consistent with this Opinion.

Before turning to the facts and analysis of this particular case, we note the absence in the record before us of any regular accounting by the receiver during the course of the receivership. Periodic accountings, whether quarterly, semi-annually, or even annually, provide the trial court with a clearer picture of the status of the receivership at any point in time and, when disputes do arise, allow for more effective trial court and appellate review. Although periodic accounting by a receiver is not mandatory, it is very strongly encouraged.

---

[1] The sum owed appears to be primarily fees for services rendered by the receiver, billed at the hourly rate, with some additional charges for expenses such as postage. We avoid characterizing the monies owed as "costs" because that term can be misleading given the issue presented.

## FACTS AND PROCEDURAL HISTORY

The Energy and Environment Cabinet is the administrative agency duly charged with the statutory duty to enforce all rules, regulations and orders promulgated for environmental protection, including those related to wastewater treatment and the prevention of water degradation. Bowling was the operator of several wastewater treatment plants (treatment plants) servicing residential subdivisions in Johnson County, Kentucky.[2] The plants owned by Bowling were improperly operated and maintained and continued to discharge untreated sewage into the waters of the Commonwealth, posing serious health risks to area residents.

Beginning in 2004, the Cabinet repeatedly issued notices of violations of wastewater regulations resulting from Bowling's inadequate operation and maintenance of the treatment plants.[3] Bowling took no action to resolve the

---

[2] Baughman states that Appalachian Waste Control, a corporation, owned the treatment plants at issue, and that Jeffrey Bowling and his father, David Bowling, owned the corporation. The Cabinet states that Jeffrey Bowling filed with the Division of Water a Change in Ownership Certification for the treatment plants. The record includes a letter dated February 13, 2002, which states that all wastewater systems owned by Appalachian Waste Control have been "given away," and that Jeffrey Bowling has accepted the systems, which he began operating on February 1, 2002. The record also contains a letter from Jeffrey Bowling to the Division of Water stating that he has accepted ownership of the five wastewater systems that are the subject of this case. Jeffrey Bowling was the only defendant named in this action and appears to be the sole owner and operator of the treatment plants.

[3] The Cabinet is responsible for protecting the waters of the Commonwealth, pursuant to Kentucky Revised Statute (KRS) 224.70-110, which states:

> No person shall, directly or indirectly, throw, drain, run or otherwise discharge into any of the waters of the Commonwealth, or cause, permit or suffer to be thrown, drained, run or otherwise discharged into such waters any pollutant, or any substance that shall cause or contribute to the pollution of the waters of the Commonwealth in

3

conditions cited by the Cabinet as noncompliant. On July 26, 2005, the Cabinet filed a complaint seeking to enjoin Bowling, as the operator, from ongoing environmental degradation by continuing to discharge untreated sewage into Kentucky waters. The complaint also requested that Bowling be required to retain a Kentucky-licensed wastewater operator to operate the plants at issue, or, in the alternative, that a receiver be appointed to take possession of the plants in question, receive the assets (including monthly payments from the subdivision residents), and perform any other necessary duties. The trial court issued a temporary injunction against Bowling that same day.

On August 11, 2005, a Cabinet representative inspected the treatment plants and found ongoing violations of the Kentucky regulations, meaning Bowling had not complied with the temporary injunction. The trial court issued a show cause order, which Bowling ignored. He was eventually arrested on November 29, 2005, and a $10,000 cash bond was posted on his behalf that same day. Despite his arrest, Bowling continued to disregard the court's temporary injunction. An inspector with the Division of Water branch of the Cabinet noted that as of May 12, 2006, some of the treatment plants were septic and nearly all the plants were in very poor condition. After Bowling's failure to comply with a second show cause order, he was arrested for the

contravention of the standards adopted by the cabinet or in contravention of any of the rules, regulations, permits, or orders of the cabinet or in contravention of any of the provisions of this chapter.

4

second time on December 19, 2006. A $33,000 cash bond was posted on his behalf the next day.

On the Cabinet's motion, the trial court appointed then-deputy master commissioner Squire Williams III as temporary receiver (the receiver) on December 21, 2006, to collect rates for the treatment plants and directed the Cabinet to petition the Public Service Commission (Commission) to pursue appointment of a permanent receiver to take over the treatment plants. On December 28, 2006, counsel for Bowling made an appearance of record. That same day, the Cabinet initiated abandonment proceedings with the Commission pursuant to Kentucky Revised Statute (KRS) 278.021.[4] In May 2007, the Commission conducted a hearing to determine if the treatment plants were abandoned, but neither Bowling nor his counsel appeared.

On February 22, 2007, the trial court ordered, by agreement of the parties, that the $10,000 bond previously posted for Bowling be turned over to the receiver, to be used in furtherance of the operation, repair, and maintenance of the treatment plants. On March 7, 2007, the trial court entered an Agreed Order on behalf of the Cabinet, the receiver, and Prestonsburg City's Utilities Commission (PCUC) that appointed PCUC as operator of the five treatment plants. The order stated that the receiver would pay PCUC $60 per month, per customer (the 90 subdivision residents serviced

---

[4] This statute allows the Public Service Commission to appoint a receiver to take control and responsibility of a public utility. It also outlines when a utility should be considered abandoned.

5

by the treatment plants), for its services. If the fees collected from the customers were insufficient for the receiver to pay PCUC, the court ordered the receiver to use proceeds from Bowling's forfeited bond, or other funds made available to the receiver by the Cabinet.

Over the next several months, the receiver made distribution motions to the trial court for payment to PCUC for its services, totaling approximately $5,400 per month, and for payment of the fees and expenses incurred by the receiver. Over the course of this litigation, these distributions to the receiver ranged from approximately $300 to $20,000.[5] The trial court ordered Bowling to submit a proposal to the court, Cabinet, and receiver outlining a payment plan and any other contributions Bowling could make to aid in the cleanup efforts for the treatment plants. On October 12, 2007, Bowling proposed that he could pay $1,000 per month "until the reasonable amount of the repair and maintenance bills [were] paid." Bowling questioned some of the costs being assessed, but nonetheless agreed to pay the receiver for overseeing the operation of the treatment plants.

---

[5] While the receiver is still owed for fees and expenses incurred because of this litigation, the receiver, through multiple distribution motions and orders, has received payments throughout the pendency of this action. The distribution orders included in the record indicate that the receiver distributed approximately $55,000 from the receivership fund to himself for the fees and expenses incurred. These distributions also ordered payment to other entities, such as the utilities companies who operated the treatment plants. Baughman began receiving distributions for his fees and expenses in December 2009. Of the $55,000 distributed to the receivers, approximately $10,000 was distributed to Baughman and approximately $45,000 was distributed to Williams.

6

The receiver responded, stating that approximately 71% of the residents regularly pay their sewer bill, resulting in an average monthly income for rate collection of approximately $3,600. At the time the receiver responded to Bowling's proposal, payment to PCUC for the basic contract charge of $5,400 per month was four months behind, and PCUC was owed for the initial repairs and maintenance of the treatment plants necessary to get them in operable condition, leaving an outstanding balance to PCUC of $33,539.03. Additionally, despite a few periodic distributions to the receiver for his services, the receiver stated that as of September 2007, he was owed approximately $17,600.[6] On October 31, 2007, the trial court entered an order directing Bowling to pay $1,000 per month to the clerk, who was directed to deposit the payments into the receiver's account for the operation of the treatment plants.

On January 24, 2008, the trial court ordered that the $33,000 cash bond posted on Bowling's behalf be forfeited and transferred to the receiver to help service the outstanding debt owed to PCUC and the receiver. In June 2008, the court began authorizing distributions to the Paintsville Utilities Commission (PUC), who assumed operation of four of the five treatment plants.[7] The trial court continued to approve distributions to PUC and others

---

[6] Williams, the receiver at the time, stated that the average monthly costs for his fees and services was $2,488. While there are no supporting documents in the record, the receiver alludes that, in addition to this case in Franklin Circuit Court, there was also an ongoing Commission case involving a temporary rate/cost for operating the plants and efforts to establish a permanent rate.

[7] In a February 25, 2008 order, the trial court noted that all five of the treatment plants were old, and some were beyond repair, presenting serious environmental problems. The parties believed that four of the five treatment plants could feasibly be connected to the nearest municipal wastewater treatment system,

7

for operation of the treatment plants and distributions to the receiver for partial costs and fees. In September 2009, when the then-receiver, Williams, was appointed to serve as a family court judge, the trial court appointed John B. Baughman as the substitute receiver.[8]

For the following two years, the receiver continued to seek distribution orders from the trial court to pay PUC and the receiver fees. As of September 9, 2011, Bowling was delinquent in his monthly payments, owing a balance of $10,000. The court revised his payment plan to cure the deficiency and continue payments of $425 per month. This amount was to cover the costs of operating one of the treatment plants, since the four other plants were then operated by PUC. After almost another 17 months of reconfigured payment plans and Bowling's failure to pay, Bowling owed a considerable outstanding balance to the receiver, and the receiver had insufficient funds to pay for the continued operation of the single treatment plant still under his control.

On February 25, 2013, the court determined that PUC was in possession of funds, provided by the Cabinet, for a Separate Environmental Project ("SEP") to repair three treatment plants, including the one under the receiver's control. Counsel for the Cabinet and the receiver represented that the Cabinet

---

which was operated by PUC. The Neal Price treatment plant, the fifth plant originally operated by Bowling, was proposed to be connected to the Thelma Waste Control No. 2 treatment plant. The PCUC had been appointed to operate the plants for one year, so it sought to end its service on April 15, 2008. The trial court began approving distributions to PUC for its services in June 2008.

[8] Although there were two receivers appointed in these proceedings, Williams and Baughman, "receiver" throughout this opinion generally refers to either of them in their capacity as receiver.

8

anticipated more funds would be available for the repair of the plants. Given the anticipation of additional and excess funds, the court ordered that $50,000 be transferred to the receiver to cover the ongoing expenses being incurred.[9]

Ultimately, all of the plants were transferred and were under the control of PUC. On December 13, 2013, the receiver filed a motion to terminate the receivership. The motion stated that the remaining balance in the receiver's account was $1,481.56. Further, the receiver alleged that Bowling had paid the receiver $28,000 to date, but the receiver was still owed $27,005 in fees, representing $21,500 owed to Williams, the original receiver, and $5,505 owed to Baughman, the current receiver. In response, Bowling alleged that he made periodic payments totaling $40,000 in the case and reminded the trial court that he forfeited two bonds totaling $53,000.[10] No party objected to the

---

[9] The record provides little detail regarding how the Cabinet came into possession of the $50,000 it subsequently transferred to the receiver. The trial court, in its February 25, 2013 order, stated that, based on representations of the receiver and the Cabinet, PUC was in possession of $50,000 that was tendered by the Cabinet for a Separate Environmental Project ("SEP") for the purpose of repairing and upgrading nearby treatments plants, one of which was a plant owned by Bowling. The trial court further found, based on representations of the receiver and the Cabinet, that the Cabinet anticipated additional funds, in excess of the $50,000 held by PUC, would become available for the same repairs and upgrades. Further, the order stated that, based on representations by the receiver, additional funds may become available from the Commission to upgrade the treatment plants and for payment of additional expenses and costs of this litigation. The trial court then directed that the additional funds paid by the Cabinet and the PSC be transmitted to the receiver and paid out "upon approval of the court." Later, in a December 13, 2013 order, the trial court acknowledged that the Cabinet provided $50,000 to make improvements and pay related expenses necessary to transfer the treatment plants to PUC. Those appear to be the funds referenced in the trial court's February 25 order.

[10] The record before this Court reflects that the trial court ordered that Bowling's bonds for $10,000 and $33,000 be forfeited; no record exists of an additional $10,000 forfeiture as he claimed in his December 16, 2013 response.

accounting presented by the receiver, but Bowling asserted that he had paid enough and should not be required to make any more payments.

The trial court entered an order on December 23, 2013, terminating the receivership. The court noted that the Cabinet had paid $50,000, and the Commission provided $3,000, for improvements, construction, and other necessary expenses for transferring the treatment plants to PUC. But the issue as to which party was responsible for paying the receiver's deficiency remained. The court recognized that the receiver was necessary to protect the public interest at stake, and that while the Cabinet requested that a receiver be appointed, it was Bowling's conduct that gave rise to the issues. The court gave the parties two weeks to file memoranda regarding the court's authority to order the Cabinet to pay the receiver's fees.

On July 27, 2016, the court entered an order stating as follows:

> The issue remaining is whether the Receiver's costs should be paid by the Plaintiff ("the Cabinet"), or by the Defendant, Jeffrey Lance Bowling. . . . [T]he Court concludes it has the authority to order the Plaintiff to pay the Receiver's costs pursuant to AP IV, Section 1(3). The Court finds the Defendant is responsible for the payment of the costs herein, but further finds and recognizes the difficulty of the Receiver collecting a Judgment from this individual Defendant. Accordingly, the court directs and orders the Cabinet to pay the Receiver his costs in the amount of $27,005.00. . . . Upon payment of the Receiver's costs by the Cabinet, it shall be awarded a Judgment against the Defendant, Jeffrey Lance Bowling, in the same amount.[11]

---

[11] In the signature block of the trial court's order, the judge dated the order "July 27, 2015." The entry stamp affixed by the court clerk states the order was entered on July 27, 2016. Although it is conceivable that the trial court could have signed the order in 2015 and the clerk entered it on the exact same date, one year later, it is more likely that the trial court order was signed and entered on July 27,

10

The Cabinet appealed, and the Court of Appeals unanimously reversed the trial court. The Court of Appeals stated "[w]e know of nothing that authorizes the circuit court to impose upon the Cabinet as costs this receiver's expenses." After examining the order assessing costs to the Cabinet, the Court of Appeals noted that the only authority cited by the trial court was Administrative Procedures of the Court of Justice Rule (AP) Part IV, § 1(3).[12]

---

2016, and that "2015" was an oversight. There is no indication in the record as to why the court did not rule on the issue of costs until July 27, 2016, even though the responses and memoranda were filed by the parties by the end of January 2014.

[12] As discussed in note 11, there is a discrepancy regarding when the trial court order directing the Cabinet to pay the receiver was actually signed and entered. At the time the trial court purportedly signed the order (July 27, 2015), AP Part IV, Section 1(3) read as follows:

> The master commissioner shall be compensated by fees as provided in Sections 6 and 7 herein. The circuit court may allow the master commissioner a reasonable fee for acting as receiver of the court, for executing documents pursuant to court order, for performing such other functions as ordered by the court, and for performing judicial type functions in actions where the master commissioner does not execute a judicial sale.

The rules were renumbered, effective January 1, 2016. Therefore, at the time the trial court entered the order, July 27, 2016 (according to the clerk's stamp), AP Part IV, § 1(3) read as follows:

> No local rules, practices, procedures, orders, or other policies of any circuit may conflict with or controvert these rules; further, to the extent that any such policies are inconsistent or otherwise conflict with these rules, these rules shall prevail.

When the parties submitted memoranda to the trial court prior to its order assessing costs, the receiver cited AP Part IV, § 1(3), which explains why the trial court cited to that rule in its order assessing costs. In its opinion, the Court of Appeals criticized the trial court's use of this AP rule, quoting the renumbered and current version of AP Part IV, § 1(3), which has nothing to do with a receiver's costs. Baughman argues that the Court of Appeals made a fundamental and reversible error by citing the wrong rule in its opinion, but we disagree. The incorrect citation to the applicable AP rule does not amount to reversible error — it was merely an oversight.

11

Further, the Court of Appeals observed that the Cabinet was the prevailing party in this case, and it was atypical of our jurisprudence to require the prevailing party to bear costs. The Court of Appeals cited Kentucky precedent which states that "the receiver's compensation and expenses are payable from the funds in his hands, no part thereof being taxable against the party at whose instance the receiver was appointed." *Crump & Field v. First National Bank*, 17 S.W.2d 436, 437-38 (Ky. 1929). Declining to make the Cabinet a guarantor or financier for Bowling in the absence of statutory authorization, the Court of Appeals noted that the inequities of requiring taxpayers to bear the costs, would not be offset by the court's simultaneous award of a second judgment in favor of the Cabinet against Bowling.

On appeal, Baughman argues that the Court of Appeals erroneously reversed the trial court and imposed an injustice on him as the receiver. After review of the record, we must disagree.

## ANALYSIS

The trial court's order that the Cabinet was liable in the first instance for the receiver's outstanding balance (fees and expenses) is reviewed for an abuse of discretion. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

### I. The receiver's fees and expenses are not properly characterized as costs under Kentucky law.

Baughman classifies the monies owed to him as "costs," and relies on KRS 453.010, which states:

12

> No judgment for costs shall be rendered against the Commonwealth in any action prosecuted by or against the Commonwealth in its own right, unless specifically provided by statute; provided, however, that *in any civil action filed in any court of competent jurisdiction by or against the Commonwealth of Kentucky, the costs may be paid by the Commonwealth when such costs are approved and allowed by the judge of the court in which the case was filed.* Costs shall not exceed the fees allowed for similar services in other civil actions.

(Emphasis supplied.) In the same chapter, KRS 453.255(4) defines "costs" as:

> expenses of expert witnesses, cost of any study, analysis, engineering report, test or project which is found by the court to be necessary for the preparation of the party's case and necessary attorney fees, and in the case of an action to review an administrative review board decision, all such fees and other expenses incurred in the contested case proceedings in which the decision was rendered.

Although KRS 453.255 states that this definition is for "costs" as used in KRS 453.260 and 453.265, the definition has some bearing on the current case as it exemplifies the traditional costs of civil litigation. Baughman further cites Kentucky Rule of Civil Procedure (CR) 54.04(1), which provides:

> Costs shall be allowed as of course to the prevailing party unless the court otherwise directs; *but costs against the Commonwealth, its officers and agencies shall be imposed only to the extent permitted by law.* In the event of a partial judgment or a judgment in which neither party prevails entirely against the other, costs shall be borne as directed by the trial court.

(Emphasis added.) Baughman argues that KRS 453.010 satisfies the clause in CR 54.04(1) allowing costs to be assessed against the Commonwealth "to the extent permitted by law." However, the fees and expenses incurred by the

13

receiver in this action are not properly characterized as costs under CR 54.04 or KRS 453.010.

CR. 54.04(2) directs prevailing parties to prepare a bill of costs, itemizing the costs of the action, including:

> filing fees, fees incident to service of process and summoning of witnesses, jury fees, warning order attorney, and guardian ad litem fees, costs of the originals of any depositions . . . ; fees for extraordinary services ordered to be paid by the court,[13] and such other costs as are ordinarily recoverable by the successful party.

Like the Court of Appeals, we find nothing in this rule (or in caselaw addressing the rule) that would allow the expenses of a receivership to be deemed costs assessable against the Commonwealth pursuant to KRS 453.010.

Under Kentucky law, receivers are treated equally with master commissioners, who are governed by the Kentucky Rules of Administrative Procedures (AP Rules). AP Part IV, § 17(1). According to AP Part IV, § 1(3), the circuit court may allow a master commissioner (or in this case, a receiver), a reasonable fee for acting as a receiver of the court. Although the parties have not provided a detailed breakdown of the outstanding balance owed to the receiver, the record includes ledgers of the services rendered by the receiver, the time spent performing those services, and costs. The timesheets for the

---

[13] Receivership fees and expenses have never been deemed "fees for extraordinary services ordered to be paid by the court" but to the extent they could be, the prevailing party (here the Cabinet) would not be responsible.

14

services rendered include tasks such as correspondence, preparing reports for the court and pleadings, and attending hearings, with the receiver billing his time at $150 per hour. The costs include expenses for copying and postage. Of the included timesheets for services rendered and monthly costs assessments, nearly all the money owed to the receiver is for services rendered.[14]

Even though the Court of Appeals held that the Cabinet was not responsible for the costs of the receivership, it initially observed, citing *Dulworth*, that "the cost of receivership is appropriately taxed as part of the costs of a civil action." 369 S.W.2d at 133. However, the Court in *Dulworth* determined that the receivership before the court was void, due to a party's failure to show that the subject property was "in imminent danger of being lost, removed or materially injured, and that only the immediate appointment of a receiver could avert and prevent a harmful result to [the party's] rights." *Id.* at 132. Where a receiver was improperly appointed, the costs associated with the action and removal of the receiver were properly taxed against the party who petitioned for the receivership. *Id.* at 133. That is plainly not the case before

---

[14] A receiver does not have to be an attorney, but in reviewing the work performed by the receiver in this case, the monies owed to him are more akin to legal fees for services performed — attorney fees — rather than costs of the action. Baughman acknowledges that the receiver served as an attorney in this case, in addition to discharging his other duties, such as paying bills and overseeing the utilities. To the extent the fees sought are for legal services, "in the absence of a statute or contract expressly providing therefore, attorneys' fees are not allowable as costs." *Dulworth & Burress Tobacco Warehouse Co. v. Burress*, 369 S.W.2d 129, 133 (Ky. 1963).

15

us. Here, the receivership was necessary and proper to protect the public from the health risks created by the improperly operated treatment plants. *Dulworth* does not support treating the fees and expenses of a properly appointed receiver as costs.

Perhaps more importantly, even if this Court were to view the receiver's bill as costs, CR 54.04(1) states that costs shall be allowed to the prevailing party. The complaint in this action was filed by the Cabinet as the plaintiff with Bowling as the defendant. The Cabinet, in large part due to the receiver's efforts, was successful in having the treatment plants restored to proper working condition and is rightfully seen as the prevailing party in this action. While not strictly prohibited, costs are not typically assessed against the prevailing party, a principle that also generally holds true as to the fees and expenses of a receivership as illustrated by both Kentucky and United States Supreme Court precedent.

## II. Precedent does not support assessing the fees and expenses of the receiver against the Cabinet.

In *Crump & Field v. First National Bank*, 17 S.W.2d at 436, this Court's predecessor articulated the general principles regarding monies owed to a receiver. Crump & Field, along with other creditors of a coal company, instituted an action to enforce their claims. *Id.* at 436. The creditors also petitioned the court for appointment of a receiver "to take charge and preserve the property" of the coal mining company. *Id.* at 437. After borrowing funds from First National Bank to cover the expenses of operating the coal mine and then operating the mine for several months, the receiver incurred considerable

16

debts. *Id.* at 437. Following a court-ordered sale, the receiver was still owed approximately $7,000 for fees and expenses incurred and the lower court ordered that the plaintiffs-creditors who sought the receivership were liable for this outstanding balance. *Id.*

Ordinarily, a receiver is entitled to compensation for his services and expenses from the funds in his possession as a result of the receivership, regardless of who is ultimately liable to pay them. *Id.* at 438. On appeal, the Kentucky High Court held that "where there is no question as to the legality or propriety of the appointment of the receiver, the receiver's compensation and expenses are payable from the funds in his hands, *no part thereof being taxable against the party at whose instance the receiver was appointed.*" *Id.* at 437–38 (emphasis supplied). However, if a court lacked authority to appoint a receiver or the appointment was improperly made, the receiver was not entitled to have his "compensation or expenses paid from the property in his hands, but must look to the party at whose instance he was appointed." *Id.* Since the receivership was valid, the court concluded that the receiver's compensation and expenses could not be assessed against the parties who initiated the receivership proceeding. *Id.* at 440.

The *Crump & Field* Court relied in part on *Atlantic Trust Co. v. Chapman*, 208 U.S. 360 (1908), a United States Supreme Court case involving a canal company in receivership. Following the canal company's default on a mortgage with Atlantic Trust Company, the trust company initiated a foreclosure action in which it requested that a receiver be appointed to take charge of the

17

property and operate the canals during the pendency of the action. *Id.* at 365. To continue operating the canals and pay debts, the receiver obtained the court's permission to borrow money and issue certificates. *Id.* at 366. After the sale proceeds were distributed, the receiver was still owed $42,000 for the work he performed in maintaining and operating the canal systems. *Id.* at 367. The receiver petitioned the court, requesting a judgment against the plaintiff (the trust company) for the deficiency owed to him because the canal company was insolvent "and unable to respond to any judgment for deficiency . . . ." *Id.* at 368. The circuit court ultimately held that the trust company was liable for the deficiency. *Id.* at 369.

On appeal, the United States Supreme Court reversed, holding that "[n]o such liability could arise from the simple fact that it was on plaintiff's motion that a receiver was appointed to take charge of the property pending the litigation." *Id.* at 370. The *Atlantic Trust Co.* Court expressly stated that holding the trust company liable for the deficiency would be inequitable. *Id.* at 373. The Court did, however, cite cases where the party who brought suit seeking appointment of a receiver was held liable for the expenses, but deemed the circumstances in those cases "peculiar." *Id.* Baughman argues that this case also involves such special or peculiar circumstances, which caused the Franklin Circuit Court to conclude that the Cabinet should pay the receiver's outstanding balance. He cites to the lengthy proceedings in the trial court, the separate proceedings with the Commission, and the transfer of operation of the treatment plants to PUC. While these factual references are accurate, they do

18

not constitute a special or peculiar case that would justify deviating from general principles regarding payment for a receivership.

The cases cited by the Supreme Court in support of its statement that in peculiar circumstances the court should hold the party initiating the receivership liable for deficiencies are unlike Baughman's case. The first cited case, *Ephraim v. Pacific Bank*, 129 Cal. 589, 62 P. 177 (1900), dealt with a receiver appointment that was unauthorized, a circumstance not present here. A second case held that the parties to an action involving a receiver are not personally liable, "unless they have given a bond or other contract to pay [the receiver's fees and expenses] as a condition of the appointment or continuance of the receiver." *Farmers' Nat'l Bank of Owatonna v. Backus*, 77 N.W. 142, 143 (Minn. 1898). Further, *Farmers* was a special circumstance case because the benefits received by the parties, as a result of the receivership and subsequent sale of the subject property, were more than five times the amount owed to the receiver, making it inequitable to leave the receiver without compensation for his services. *Id.* Again, this special circumstance is not present in this case, where the treatment plants generated no economic benefit to the Cabinet. Finally, the other peculiar circumstance case cited in *Atlantic* is *Cutter v. Pollock*, 76 N.W. 235, 237 (N.D. 1898), another case in which a receiver's appointment was unauthorized, creating justification for holding the plaintiff, who sought the receivership, liable for the receiver's expenses. Although there may be cases where equity requires the party at whose instance a receiver was

19

appointed to cover the fees and expenses of the receivership, this is not one of those cases. As the Supreme Court stated:

> We do not think that the mere insufficiency of the property or fund to meet the expenses of a receivership entitled the receiver to hol[d] the plaintiff in the suit personally liable, if all that could be said was that he instituted the suit and moved for the appointment of the receiver to take charge of the property and maintain and operate it pending the suit.

*Atlantic*, 208 U.S. at 375.

In arguing special circumstances, Baughman states that the trial court reviewed ample evidence that Bowling was "judgment proof" throughout the seven years of litigation following appointment of the receiver. However, the record suggests that Bowling in fact made payments throughout the pendency of this litigation. In his response to the receiver's motion to terminate the receivership and pay costs, Bowling alleged that he had already made $40,000 in periodic payments and forfeited $53,000 in bonds,[15] all of which went to the costs of repairing and operating the treatment plants. The receiver did have to make numerous motions seeking trial court action in response to Bowling's failure to pay and late payments, but nonetheless payments were made. Although the Cabinet is likely in a better position to pay the outstanding balance even if just in the interim, we find no legal grounds for imposing the receiver's fees and expenses on the Cabinet. Also, as the Court of Appeals observed, while it may be more difficult for the receiver to collect from Bowling, we cannot say it would be impossible.

---

[15] See fn. 9 *supra*.

20

In sum, no special circumstances exist in this case to justify requiring the Cabinet, a state agency funded in large part by taxpayers, to cure the receiver's deficiency.[16] Although the trial court's approach would ultimately hold Bowling responsible for the outstanding balance owed to the receiver (at least in theory), using the Cabinet as a "middle-man" contravenes Kentucky law. Furthermore, requiring the Cabinet to pay the balance but granting a simultaneous judgment in its favor against Bowling will simply insure additional litigation and create more costs for all parties involved. While we can understand the trial court's interest in seeing the receiver fully compensated, we cannot approve a method that is not grounded in statute or our case law.

## CONCLUSION

Kentucky law does not support requiring the Cabinet, the prevailing party, to pay the outstanding balance owed to the receiver, even if the Cabinet is then awarded a judgment against Bowling. While it may be difficult for the receiver to collect from Bowling, it certainly does not appear impossible. The trial court, although well-intentioned in light of the benefits realized as a result

---

[16] In 2018 the Kentucky General Assembly passed KRS 224.73-150 "Conditions for appointment of receiver to manage and operate privately owned small wastewater treatment plants; attachment and control of plant's assets; hearings, permitted actions and orders." The statute became effective July 14, 2018. Subsection (4) states:

> During the pendency of any receivership, the receiver may bring or defend any cause of action on behalf of the owner of the plant as the court may authorize, including an action to raise rates or institute surcharges as necessary to properly operate, maintain, restore, and rehabilitate the plant and to pay the costs, fees, and expenses of the receiver.

21

of the receiver's services, abused its discretion. For the foregoing reasons, we affirm the Court of Appeals' opinion reversing the Franklin Circuit Court's order requiring the Cabinet to pay the receiver's outstanding balance and remand to the circuit court for entry of a new order consistent with this Opinion.

Minton, C.J.; Hughes, Keller, Lambert, VanMeter, and Wright, JJ., sitting. All concur. Buckingham, J., not sitting.


COUNSEL FOR APPELLANT:

John B. Baughman
BAUGHMAN HARP, PLLC


COUNSEL FOR APPELLEE:

John S. West
Daniel Cleveland
Office of General Counsel
Kentucky Energy and Environment Cabinet

# Supreme Court of Kentucky

2018-SC-000104-DG

JOHN B. BAUGHMAN                                                      APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                    CASE NO. 2016-CA-001181-MR
FRANKLIN CIRCUIT COURT NO. 05-CI-01007

COMMONWEALTH OF KENTUCKY,                            APPELLEES
ENERGY AND ENVIRONMENT CABINET
AND JEFFREY LANCE BOWLING

## ORDER OF CORRECTION

The Opinion of the Court rendered April 18, 2019, is corrected on its face

by substitution of the attached corrected Opinion entered May 13, 2019, in lieu

of the original Opinion of the Court. Said correction does not affect the holding

of the original Opinion of the Court.

ENTERED: May 13, 2019.

_____
CHIEF JUSTICE